## DUVALL *v.* STATE OF INDIANA.

[No. 13,677.   Filed May 28, 1929.   Rehearing denied October 2, 1929. Transfer denied January 29, 1931.]

*Martin M. Hugg, Eph Inman, Harvey A. Grabill, Ryan, Ruckelshaus, Ruckelshaus & Ryan* and *William V. Rooker,* for appellant.

*Arthur L. Gilliom* and *James M. Ogden,* Attorney-Generals, and *Harry L. Gause,* for the State.

McMahan, P. J.—An affidavit was filed against appellant charging that, when he was a candidate for mayor of the city of Indianapolis, he unlawfully promised William H. Armitage, that if he, appellant, were elected mayor, Armitage might name two members of the board of public works of said city and the city civil engineer, said offer being of advantage, aid and value to Armitage, and being made for the purpose of inducing and procur-

ing Armitage to vote, aid and work for the election of appellant in the election; that, as a further consideration for said promise so made by appellant, Armitage agreed to, and did pay appellant the sum of $10,000. A motion to quash was overruled, after which the cause was tried before a jury and resulted in a conviction, appellant's punishment being fixed at a fine of $1,000 and imprisonment in the county jail for 30 days. The jury also found that he should be ineligible to any public office or public employment for a period of four years from November 2, 1925.

The errors assigned are the overruling of a motion to quash the affidavit, and the overruling of the motion for a new trial.

Section 7671 Burns 1926, §11, Acts 1911 p. 288, *inter alia*, provides: "The following persons shall be guilty of corrupt practices and shall be punished in accordance with the provisions of this act. Every person who shall, directly or indirectly, by himself or another, give, or offer or promise to any person any money, gift, advantage, preferment, entertainment, aid, emoluments, or any valuable thing whatever, for the purpose of inducing or procuring any person to vote or refrain from voting, for or against any person, or for or against any measure or proposition at any election or primary election or political convention or session of the General Assembly of the State of Indiana, or either house thereof. . . . Every person who shall be guilty of any corrupt practice as aforesaid, shall be fined not less than $300, nor more than $1,000, or be imprisoned for not more than one year, or both, and shall be ineligible to any public office or public employment for the period of four years from and after the time of the commission of such offense."

In support of the first assignment, appellant insists that the promise alleged in the affidavit is not unlawful and does not constitute a crime; that the "gift, advan-

tage, preferment, entertainment, aid, emoluments, or any valuable thing whatever," must have a property value measured in money; and that the alleged promise is not money nor a "gift, advantage, preferment, entertainment, aid or emolument," within the meaning of the statute. In support of this contention, appellant cites and relies on *State, ex rel.,* v. *Patterson* (1914), 67 Fla. 499, 65 So. 659; *Van Meter* v. *Burns* (1917), 176 Ky. 153, 195 S. W. 470; *Graham* v. *Alliston* (1918), 180 Ky. 687, 203 S. W. 563; *Hardin* v. *Horn* (1919), 184 Ky. 548, 212 S. W. 573.

*State, ex rel.,* v. *Patterson, supra,* was a proceeding to compel the county commissioners to place the relator's name on the official ballot as a candidate for the office of member of the board of public instruction at the primary election to be held June 2, 1914. The petition alleged that on May 13, 1914, the relator filed with the clerk his statement as to his qualifications to become a candidate; that the commissioners refused to print his name on the ballot because he had not filed a sworn statement of his expenses as a candidate 25 days before the date of the primary; that the relator had not, prior to May 12, 1914, announced to any person or to the public that he was a candidate, and that, as a fact, he was not, prior to said day, a candidate, and not being a candidate 25 days before the primary, he was not required to file such statement on May 8, that being the day on which all who were then candidates were required to file such statement. It was held that since the relator did not become a candidate prior to May 12, he was not required to file the statement 25 days before the date of the primary; that he was not required to file such statement at a time when he was not, in fact, a candidate. No other question was presented or decided, and we find nothing in the opinion of the court bearing on any question involved in the instant case. The Corrupt Practice Act of Ken-

tucky provided that it shall be unlawful for any person who is a candidate "to expend, pay, promise, loan or become pecuniarily liable in any way for money or other thing of value." The Supreme Court of that state, in the three cases last cited, correctly held the words "other thing of value" as used in the statute, did not include a promise made by a candidate to appoint a particular person as a deputy. All the things specifically mentioned in the statute related to money, and it was clear that, under the *ejusdem generis* maxim of construction, "other thing of value," as there used, must refer to things having a money value.

The statute of this state is more comprehensive than the Kentucky statute. Our statute covers a gift, offer or promise of any "money, gift, advantage, preferment, entertainment, aid, emoluments, or any valuable thing whatever."

The Supreme Court of Arkansas, in discussing a promise of a candidate for mayor, if elected, to vote for a certain person for the office of city attorney, said: "The effect of such a promise, if fulfilled, would be to bestow a benefit upon the promisee in the sense of the statute. The obvious purpose of the law was to cover not only a promise to give an office, position, or employment, but to include every official favor that might be within the power of the officer to confer.' *Wright* v. *State* (1918), 133 Ark. 76, 83, 202 S. W. 236.

Advantage is defined as "any state, condition, circumstance, opportunity, or means, specially favorable to success, prosperity, interest, reputation, or any desired end." Century Dictionary. By the same authority, preferment, is defined as, "the act of preferring or esteeming more highly, or the state of being preferred." It seems quite clear to us that a promise by a candidate for mayor to allow another person to name two of the three members of the board of

public works and to name the city civil engineer in a city of the size of Indianapolis, and a promise by such candidate, that he will, if elected to such office, appoint the persons so selected by the one to whom such promise is made, is to give the promisee an advantage and preferment within the Corrupt Practice Act. The promisee, in the instant case, certainly thought the promise to allow him to name two members of the board of public works an advantage and preferment given to him that no other individual could expect. To him it was evidently a thing of value, otherwise he would not have given $10,000 to appellant as a part of the consideration for the latter's promise. The purpose of the statute was to prevent the influence of voters, not by the use of money alone, but by any of the inducements enumerated in the statute. *Fox* v. *State* (1917), 186 Ind. 299, 116 N. E. 423. We cannot agree with appellant in his contention that the agreement which he is alleged to have made was not a violation of the statute. The alleged transaction is no less than a sale of the privilege of naming important city officers, the consideration being the support of Armitage and the payment by the latter of $10,000, in money. The court did not err in overruling the motion to quash.

Appellant complains of the action of the court in overruling his objections to certain questions asked each of 12 witnesses, eliciting promises made by him to each of such witnesses, of political preferment, similar in nature to the promise made Armitage, all of the promises being made for the purpose of securing votes and political support. One of these witnesses was William Freeman, who was a member of the board of public works of the city of Indianapolis during the time appellant was a candidate for mayor, and one of the two men whom Armitage had indicated he desired appellant, when elected, to appoint as members of that board, and whom appellant had

promised Armitage he would appoint. Freeman had been active politically and was county chairman of his party at the time appellant was elected county treasurer. He testified that he had a conversation with Armitage, after which he called on appellant, at his home, on June 16 or 17, 1925; that he told appellant about his conversation with Armitage and that he had been told of certain things appellant desired of the witness and which appellant wanted to talk over with the witness; that appellant told the witness he had certain arrangements with Armitage and said: "I want you to help me be elected mayor, use all your influence and efforts possible to do so. I want you to remain as a member of the board of public works when I am elected, and be its president"; that appellant told him who would be the other Republican member and who would be the city engineer; that appellant said he wanted the witness to understand that the arrangements made with Armitage would be kept; that he would expect the witness to give him $2,500, for the position he was offering the witness; that appellant said it was necessary for his election that he should have the solid support of Armitage, but he wanted the witness to see that Armitage remained in the background and under cover as he had asked the witness to do. He also testified that he gave Armitage $500, for appellant's campaign. In this connection, it is well to refer to the fact that Armitage had already testified that, after he had given appellant $10,000, he gave him $4,500, in $500 and $1,000 payments. All of the $4,500 was money of the witness except that Freeman had given him $500 to give appellant and that, when he gave it to appellant, he told appellant Freeman had given that $500 and that he had told Freeman of his talks with appellant.

Harvey W. Bedford had been active politically in Indianapolis. He testified that appellant asked for his help; that he undertook to build up a political organiza-

tion for appellant and had a conversation with appellant, in regard to the support of George V. Coffin; that appellant said he would have to have the support of Coffin; witness told him that it could be done; that appellant said he did not think it could; when witness told him he would call a body of precinct committeemen and have Coffin there and that the latter would endorse appellant, appellant told him to go ahead and do it, saying if he did that, he, appellant, would make him a present of the best automobile money would buy and would give it to him immediately after he was elected mayor. He also testified that appellant promised to appoint him superintendent of parks.

One witness had been promised for his support the position of market master. Another witness, who was a clerk in the city engineer's office, was promised for his support that he could have the same appointment, or a better one. Another was promised an appointment as recreation director. Other witnesses, who were or had been active members of the "Klan" and who were active politically, testified about several meetings with appellant and promises made by him to the effect that, if elected, he would make 85 per cent of his appointments from those who were members of the Klan, and the other 15 per cent from Catholics and Protestants who were not members of the Klan. The testimony was that one of these promises was made at a meeting with four active members of the Klan, one at a meeting of 14 members of the Klan and one at a closed meeting of the Klan attended by 1,500 people, and held about 30 days before the primary. This last named meeting was attended by a large number of candidates, including appellant, who took their place on the stage and, in the presence of the 1,500 members of the Klan, with uplifted hands, took the oath of the Klan, that, if nominated and elected, 60 per cent or more of their appointments would be from

members of the Klan, and that they would not receive instruction or dictation from any political group in Marion County other than the Klan. Other witnesses testified that appellant promised each of them an appointment to an office in consideration of his political support.

The appellant objected to the testimony of each of these witnesses on the ground that the evidence sought to be elicited related to a separate and distinct matter, in no way related to matters charged in the affidavit, and was an effort to prove charges contained in the affidavit by showing separate and distinct offenses having no relation to or bearing upon the issues contained in the affidavit in this case, and, for the further reason, that it would prejudice the defendant and his cause of defense. In this connection, it was stated by appellant's counsel that appellant did not contend and would not contend that the acts shown by the State were susceptible of any innocent interpretation, and that the charges with reference to the promises to Armitage to permit the selection of two members of the board of works and the city engineer would be wholly denied.

Appellee, in support of the action of the trial court, says the evidence in question was proper as tending to show a system, purpose and intent of appellant in making the promise: that the promises made to Armitage and to each of the 12 witnesses were to secure votes and support in the election; that the combination of circumstances was sufficient to establish a common plan on the part of the appellant to violate the law in order to accomplish his desire.

We agree with appellant that proof of other crimes than the one for which a defendant is being tried is never permitted to prove the *corpus delicti*, and that such evidence is only permissible in the trial of a criminal case where the act constituting the crime

under investigation has been clearly established and the motive, intent or guilty knowledge of the defendant is an issue. See *Kahn* v. *State* (1914), 182 Ind. 1, 105 N. E. 385, and *Clevenger* v. *State* (1919), 188 Ind. 592, 125 N. E. 41.

In *Clevenger* v. *State, supra,* the Supreme Court, speaking through Lairy, J., said: "It has been frequently decided that proof of the commission of other criminal acts may be proved for the purpose of showing a criminal *purpose* or intent or guilty knowledge, in cases where such purpose, intent, or knowledge is an essential ingredient of the crime charged, and where the evidence of such other acts tends to establish such criminal motive, intent or such guilty knowledge." (Our italics.)

In *Higgins* v. *State* (1901), 157 Ind. 57, 60 N. E. 685, a member of the common council of a city was indicted for violating a statute making it a crime for a member of the common council to solicit money "to influence him with respect to the discharge of his duties." In that case, as in the instant case, when evidence of other like offenses was offered, the defendant insisted that if the act charged was proved, the crime, if it were a crime, was complete, and that the intent or purpose for which the act was done was not susceptible of an innocent interpretation, and, that the act which he was charged with doing would be wholly denied. In that case, the defendant was charged with soliciting pay to "influence" his action, while in the instant case, appellant was charged with making a promise for the "purpose of inducing" another to act. The Supreme Court, in the Higgins case, held that the admission of evidence of similar offenses was proper.

Section 7671, *supra,* makes purpose an essential ingredient of the offense therein defined, and we hold the court did not err in admitting the evidence of which complaint is made.

Appellant complains of instruction 14, given by the court of its own motion, wherein the jury was told if it was "satisfied of the guilt of the defendant as charged," it then became its duty to fix his punishment within the statutory limitations, which were correctly stated. Appellant says this instruction was erroneous in stating if the jury was "satisfied of the guilt" of the defendant, instead of telling the jury it "had to be convinced of his guilt beyond a reasonable doubt." The court, in eight other instructions, four of which were given at the request of appellant, fully and correctly instructed the jury on the subject of reasonable doubt, so that the omission of the words "beyond a reasonable doubt" in the instruction of which complaint is made could not have misled nor confused the jury. There was no error in giving this instruction.

Appellant further contends the verdict is not sustained by sufficient evidence and that it is contrary to law. This contention is based upon the theory that the promise of appellant to allow Armitage to name the two members of the board of public works, and the city engineer, and the promise of appellant to appoint the persons named by Armitage to such positions are not covered by the statute. Appellant makes no claim that the evidence is not sufficient to prove the facts as alleged in the affidavit upon which he was prosecuted. Having held the affidavit good as against a motion to quash, and all the facts alleged in the affidavit having been proved, we hold the verdict is sustained by sufficient evidence, and in so far as this contention is concerned, the verdict is not contrary to law.

Appellant calls attention to that part of §7671, *supra,* which provides that a person found guilty "shall be ineligible to any public office or public employment for the period of four years from and after the time of the

commission of such offense," and says that if any promises were made, they were made in the latter part of May or the early part of June, 1925, and that the verdict is contrary to law because of the clause therein fixing the period of ineligibility at a period of four years from November 2, instead of from the time in May or June when the promises were made. The statute does not require the jury to insert in its verdict the date when the offense was committed, and that the defendant is ineligible to hold public office and public employment from that date, nor was it necessary for the court to fix that period in the judgment. Kentucky has a statute which provides that a person carrying a concealed deadly weapon, on conviction, shall be fined not less than $50, nor more than $100, and imprisoned in the county jail not less than 10, nor more than 40 days, with the further provision that any person convicted under the statute "shall be disfranchised and such conviction shall operate to exclude such person from the right of suffrage for the period of two years from the date thereof." The Supreme Court of that state, in *Franklin* v. *Commonwealth* (1922), 195 Ky. 737, 244 S. W. 299, held that the disfranchisement attached as a consequence of conviction and was not dependent for its enforcement upon the recommendation of the jury, but should be included by the court in its judgment in all cases of conviction, independently of any reference thereto in the verdict.

In *Borino* v. *Lounsbury* (1913), 86 Conn. 622, 86 Atl. 597, the appellant entered a plea of guilty to a charge of obtaining money under false pretenses and was fined. Thereafter, the clerk notified the selectmen of the town that the appellant had been convicted of a crime which worked a forfeiture of his civil rights, and the registrar of voters struck his name from the list of voters. There was no finding or judgment that his privileges as an

elector had been forfeited, yet the court sustained the registrars in striking the name from the list of voters.

The general rule seems to be that under constitutional and statutory provisions forfeiting a right upon conviction of a crime, the conviction, in and of itself, works the forfeiture. See *People* v. *Fabian* (1908), 192 N. Y. 443, 85 N. E. 672, 18 L. R. A. (N. S.) 684, 127 Am. St. 917, 15 Ann. Cas. 100, and authorities there cited; *United States* v. *Watkinds* (1881), 6 Fed. 152; *State, ex rel.,* v. *Buckman* (1881), 18 Fla. 267.

As before stated, that part of the verdict fixing the fine and imprisonment, is not contrary to law. That part finding that appellant shall be ineligible to any public office or public employment for a period of four years from November 2, 1925, may be treated as surplusage, as it was not necessary that the jury, in its verdict, fix the period of such ineligibility. The statute fixed that period, and it was not in the power of the jury in this case to add to or detract from that period. The fact, if it be a fact, that the jury erroneously included a wrong period of ineligibility in the verdict and that the same was carried into the judgment does not require a reversal of the judgment fixing the fine and imprisonment. *Dorsey* v. *State* (1913), 179 Ind. 531, 100 N. E. 369; *Kennedy* v. *State* (1878), 62 Ind. 136; *Cohen* v. *State* (1894), 10 Ind. App. 339, 37 N. E. 809. As heretofore indicated, the statute and not the verdict fixes the period of ineligibility. The verdict of the jury and the judgment of the court without any reference to appellant's ineligibility would have rendered him ineligible to public office and public employment for the period named in the statute. The statute, plus the conviction, determined appellant's civil right to public office and employment. Appellant would not have been harmed if the trial court had treated the part of the verdict in question as surplusage and had simply adjudged

that he be fined and imprisoned. While there is some question as to whether appellant should not have treated this matter as surplusage and moved to modify the judgment instead of attempting to present the question in his motion for a new trial, we have, without deciding that question, resolved the doubt in favor of appellant, and, for the purpose of this case, will assume the question is properly presented.

The judgment is affirmed in so far as the fine and imprisonment are concerned, and reversed in so far as the period of ineligibility is concerned, with direction to strike out of the judgment the part relating to the ineligibility of appellant to public office and public employment.

Remy, J., not participating.